

**PETERKIN BURGESS**

ATTORNEYS AT LAW

October 20, 2025

Attn: Bill Groffy                          **Via Certified Mail No. 7019 0700 0002 1725 5200**
Principal Deputy Director          **Return Receipt Requested**
Contracting Agency
Bureau of Land Management
1849 C Street, N.W.
Washington, DC 20240

Attn: Barry Bushue
Contracting Agency/Officer        **Via Certified Mail No. 7019 0700 0002 1725 5170**
State Director                          **Return Receipt Requested**
Oregon, BLM
1220 S.W. 3rd Avenue
Portland, Oregon 97204

Attn: Amanda Roberts                **Via Certified Mail No. 7019 0700 0002 1725 5187**
Contracting Agency/Officer        **Return Receipt Requested**
District Manager
Prineville District, BLM
3050 N.E. 3rd Street
Prineville, Oregon 97754

---

## NOTICE
### *CONTRACT DISPUTES ACT OF 1978*, 41 U.S.C. §§ 7103(A)(1) AND (2)

### I.     Claimant

*South Fork Ranch LLC* ("SFR") is a duly formed and existing Oregon limited liability company. SFR is the owner of the at-issue private land and associated usufructuary rights. **Exhibit 1** (Statutory Warranty Deed). SFR is the seller's assignee of "any right, title, interest, damages, and claims" that its predecessor in title, *Waibel Properties LLC* and *Waibel Ranches, LLC* ("Waibel"), had under the 2016 Contract. See **Exhibit 2** (Assignment and Substitution Agreement).

### II.    Introduction

The subject dispute involves a 2016 Contract between the Bureau of Land Management ("BLM") and Waibel. **Exhibit 3** (Contract). The land and easement at

CDA Notice
October 20, 2025
Page **2** of **10**

issue are in Crook County, Oregon. The Contract was reached after Waibel sued BLM to quiet title to an easement and to enforce its 2015 agreement with BLM.

BLM made a unilateral offer that if the Waibel built an alternative road that meets the agreed-upon road standards, the "New Road" would be accepted by BLM, and the BLM easement that burdened the Waibel's property would conditionally restrict public access. Next, BLM agreed to exchange a 160-acre parcel crossed by the subject easement for a substantially equal valued parcel. Next, after a NEPA review and upon the successful exchange, the public's right to use the easement would be permanently extinguished.

In 2017, Waibel completed construction of the New Road as required by the Contract at a cost of more than $2,988,619.11, which includes the cost of construction and engineering. The cost of permits and required governmental and environmental studies will be provided when cost documents are received.

Waibel donated the nearly 5.5-mile New Road to Crook County as the Contract required. The county accepted the donation. That donated land occupied by the New Road is now public land. Consequently, SFR has two roads that burden its ranch that are open to public travel.

Waibel constructed the New Road according to the Contract road design and construction standards. BLM disagreed. Despite Waibel's performance under the Contract, BLM requested additional road work. Waibel and BLM could not agree on the scope of any requested additional road work, which Waibel argued was unnecessary. The litigation was stayed, and extensive negotiations and settlement efforts followed for over four years. Negotiations addressed the New Road, the easement, NEPA review, and the exchange of BLM's 160-acre parcel. On or around September 17, 2021, settlement negotiations terminated, at which time, the BLM repudiated the Contract and filed a motion to dismiss the landowner's lawsuit.

Waibel's case against BLM was dismissed based on the government's motion that asserted a statutory time bar. The 9th Circuit Court of Appeals disagreed and reversed, in part. *Waibel Ranches, LLC v. United States*, No. 22-35703, 2024 WL 3384233, at 1 (9th Cir. July 12, 2024). During the appeal process, Waibel sold the property at issue to South Fork Ranch in 2023 and assigned to it all Waibel's rights under its Contract with BLM.

## III.    Timely Notice

The Contract Claim is timely submitted. The Claim is submitted "within 6 years after the accrual of the claim" as per 41 U.S.C. § 7103(a)(4). See also 48 C.F.R. § 33.201. The "accrual of the claim" occurred on or about September 2021, when the BLM repudiated the Contract by refusing to accept the as-built New Road and refusing to perform its obligations under the Contract. Instead, BLM filed a "Motion to Dismiss"

CDA Notice
October 20, 2025
Page **3** of **10**

Waibel's claims on November 15, 2021. Doc. No. 110, Case No. 2:15-cv-02071-HL, U.S. District Court, District of Oregon ("the QTA Lawsuit"). Further, BLM and Waibel agreed to toll claims and all litigation to facilitate ongoing settlement negotiations:

> "[T]he parties agree not to pursue any disputed claims or relief related to the validity or scope of the existing easement and/or right-of-way that the United States presently holds and owns for the use of Teaters Road so long as the pending stay in this case is in effect, or the New Road, *** remains open to the public and federal, state, and local agencies …."

> In addition, "the parties agree to jointly move for one or more further extensions of this stay beyond the one sought by the present motion, until all of the foregoing intended steps set forth above have been completed. At the same time, both Waibel and BLM reserve the right to move to lift the stay in this case if one or more of the intended steps described above [have] been renounced, abandoned, or [are] no longer being pursued."

Exhibit 3, p 9-10. On September 17, 2021, the mediator notified the court that the QTA Lawsuit did not settle. So, arguably, the litigation stay was no longer in effect. BLM, however, never moved to lift the stay and never expressly repudiated the Contract. Instead, BLM filed its Motion to Dismiss the QTA Lawsuit, which was the first clear notice that BLM was repudiating the Contract and would not fulfill its obligations under the unilateral Contract as promised.

## IV.   The Easement

The background of this Contract Claim involves a dispute over the validity, scope, and permissible uses of the United States's easement known as Teaters Road, a dirt road primarily on SFR's private property. The easement was granted to the United States on August 31, 1964, by the North Fork Livestock Company ("1964 Road Easement"), a predecessor in title to Waibel and SFR. **Exhibit 4**. ORS 42.220 instructs the court to consider the circumstances under which the contract was made when construing the instrument.

In 2014, Waibel asserted that his survey of his property revealed that the metes-and-bounds descriptions of the 1964 Road Easement excluded a 350-foot section ("the Gap"). Waibel informed BLM about his survey. In 2015, BLM and Waibel reached an agreement to close Teaters Road to public access. Months later, the BLM repudiated that 2015 agreement. Waibel then filed the QTA Lawsuit under 28 U.S.C. § 2409a, seeking a judgment that, among other things, quieted title to the Gap (first claim for relief) and requested certain declarations about the validity, scope, and permissible

CDA Notice
October 20, 2025
Page **4** of **10**

uses of the easement, considering the 2015 agreement (second claim for relief). Against this factual backdrop, the parties negotiated the Contract.

## V.    The Contract

The 2016 Contract was reached and filed in the form of a "Joint Motion for Further Extended Stay of Proceed[ing]" dated May 20, 2016, Doc. No. 30, Case No. 2:15-cv-02071-HL, U.S. District Court, District of Oregon.[1]   On May 23, 2016, the Court issued an Order approving the "Joint Motion*." Id.*, Doc. No. 31.  The Contract was signed by Waibel's attorney and the Assistant U.S. Attorney, for the U.S. District Court, District of Oregon, on behalf of the authorized contracting officers for the BLM.

All contract conditions to be performed by Waibel were performed in a timely manner. The main general Contract terms are summarized as follows: 1) Waibel builds a new road; 2) Waibel donates the road to the county; 3) the county accepts the donation; 4) BLM maintains the road; 5) BLM completes a NEPA review of Teaters Road to preclude public use; 6) Waibel pays up to $100,000 towards the NEPA process; 7) Waibel and BLM exchange a BLM parcel surrounded by SFR land; and 8)  BLM closes Teaters Road to public travel. The parties also agreed to stay the litigation during the Contract performance.

The Contract Disputes Act of 1978 "applies to any expressed or implied contract … made by an executive agency for -- … procurement of construction … of real property." 41 U.S.C. § 7102(a)(3). Under the CDA, procurement means the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government." *Summit Multi-Fam. Hous. Corp. v. United States*, 124 Fed. Cl. 562, 569 (2015), (internal quotations and emphasis omitted), quoting with approval, *New Era Constr. v. United States,* 890 F.2d 1152, 1157 (Fed.Cir.1989).

Here, an express contract was formed between the BLM and Waibel for the construction of an alternate public road, which was a condition precedent to extinguish public access on the 1964 Road Easement.  Waibel built the alternate public road and fulfilled all conditions on its part that could be performed on its part. See **Exhibit 5** (as-built road on SFR property).

The Contract road terms were unilateral. As Williston explains: "In the context of unilateral contracts, a contract arises upon the completion of the requested performance, without the necessity of mutuality of obligation between the parties. A unilateral contract is formed when one party makes a promise in exchange for the other party's act or performance, which constitutes sufficient consideration." *Williston on Contracts* § 7:15 (4th ed.)

---

[1] After SFR was substituted as a party, the court assigned a new case caption and number: *South Fork Ranch LLC v. United States of America*, Case No. 2:25-cv-00186-HL, U.S. District Court, District of Oregon.

The court in *Moro v. State,* 357 Or 167, 198, 351 P.3d 1, 21 (2015) held: "An offer for a unilateral contract invites the other party to accept with performance—that is, by actually *doing* the performance that the offering party [here BLM] seeks. \*\*\* As a result, by the time that an offer for a unilateral contract is accepted, the accepting party [here Waibel] has already fully performed and owes the offering party no future obligation. *Id.* In that case, the resulting contract is unilateral because only the offering party [BLM] owes a legally enforceable obligation to the other." See *Ketcherside v. McLane*, 118 S.W.3d 631 (Mo. App. 2003) ("Offer to make a unilateral contract is accepted when the requested performance is rendered").

Importantly, once substantial performance has been rendered, the offer under a unilateral contract cannot be revoked. "Where one party makes a promissory offer in such form that it can be accepted by the rendition of the performance that is requested in exchange, without any express return promise or notice of acceptance in words, the offeror is bound by a contract just as soon as the offeree has rendered a substantial part of that requested performance. *1 A. Corbin, Contracts* § 49." *Sigrist v. Century 21 Corp.,* 519 P.2d 362, 363 (Colo. App. 1973), quoting Corbin with approval.

Here, BLM made a unilateral offer that if Waibel built an alternative road that meets the specified road standards, then the New Road would be accepted after donation to the county, and the 1964 Road Easement would eliminate public access immediately after the BLM 160-acre parcel became private property.

## VI.    Claimant's Performance and BLM's Breach

The Contract stated that the "primary objectives" of the Contract were threefold: "(1) restoring public access from Highway 380 to the public lands and National Forest System lands that lie to the north of [Waibel's] property in a timely fashion; (2) ensuring compliance with all applicable laws and regulations; and (3) achieving a mutually acceptable resolution that will obviate the need to litigate the claims in this Court, thereby allowing the parties to devote their energies and resources toward pursuing, reaching, and implementing such a resolution instead of expending them on any such litigation if possible." Exhibit 3, p 2. Waibel fulfilled its performance of the Contract conditions as follows:

**1. Road Construction.** The fundamental condition was to construct the alternate road. Waibel performed all necessary road construction conditions. The New Road meets the primary term under the Contract. The road construction condition reads:

> First, on their own initiative and at their own expense, and for the purpose of providing an alternate route that will provide for access to the same public lands to the north and the same types of uses at a similar level as those which have historically been provided by Teaters

CDA Notice
October 20, 2025
Page **6** of **10**

> Road, and will be designed so as to require maintenance at no greater a level than that which has generally been required on Teaters Road during the period of its public use, Plaintiffs intend to construct a new road ("New Road") solely on Plaintiffs' private property on Waibel Ranch near the ranch's western boundary, substantially along the route depicted on the map attached as Appendix A.

Exhibit 3, p 2. Road construction was required to meet the Contract requirements and the ODOT design and construction standards. *Id*. at 3-4. The Contract stated: "Any design features of the New Road not addressed by the standards explicitly referenced above will be designed in accordance with the 2012 version of the Oregon Department of Transportation (ODOT) Design Manual." The Contract further stated that Waibel would construct the New Road in compliance "with the standards specified in the 2015 version of the ODOT's Standard Specifications for Construction." *Id*.

Further, the road was constructed in a timely manner as required under the Contract. Moreover, all road conditions were met. For example, the road construction plans were prepared by a certified professional engineer as required. *Id*. at 4; See Exhibit 5. A licensed road contractor, Taylor NW, was hired to perform the road construction as required under Oregon law. Permits were obtained from the U.S. Army Corps of Engineers **(Exhibit 6**), a Stormwater Analysis from Resource Specialists, Inc. **(Exhibit 7**), and water quality certification approval from the Oregon Department of Environmental Quality (**Exhibit 8**). The Oregon Department of State Lands performed a wetland function assessment involving the road crossings over Sheep Rock Creek. **Exhibit 9.** A fish passage plan was approved by ODFW. **Exhibit 10**. The State Historic Preservation Office reviewed and concluded "that the road project will likely have no effect on any significant archaeological objects or sites." **Exhibit 11**. A private contractor conducted a wetland delineation to facilitate the road construction. **Exhibit 12**.

    **2. Ordinary Principles of Contract Law Apply.** After the road was constructed, BLM requested corrections, which were completed. See **Exhibit 13** (Supplemental Engineering Report dated 10/30/2018). Consequently, BLM affirmed and ratified the Contract, including the road standards specified in the Contract. The engineer McCoy observed:

> Construction of the relocated Teater's Road according to the computer design model and GPS controlled construction equipment resulted in a completed road that met horizontal and vertical geometric requirements, other than minor road grade variance described above, that was adjusted to conform to the applicable ODOT standards. This is a noteworthy result considering the potential for variations between actual ground topography and topographic survey data used to develop the model and potential variations between actual

CDA Notice
October 20, 2025
Page **7** of **10**

>    horizontal ground feature locations and horizontal survey data also
>    used to develop the model. The supplemental construction work by
>    Taylor NW corrected punch list items and corrected the minor road
>    grade between stations 244+ 14 and 249+65.

Exhibit 13, p 4.  McCoy concluded by saying that "Completion of minor
supplemental construction work by Taylor NW described above brought the
constructed road into compliance with the road design and construction
specifications." *Id.*

Consequently, SFR is entitled to specifically enforce the Contract or to recover its
damages. **"**In evaluating the relevant documents and circumstances, we have, of
course, followed the Federal Circuit in applying ordinary principles of contract
construction and breach that would be applicable to any contract action between
private parties**.** *United States v. Winstar Corp.*, 518 U.S. 839, 870–71, 116 S. Ct. 2432,
2453, 135 L. Ed. 2d 964 (1996). Also, see *Sharpe v. F.D.I.C.*, 126 F.3d 1147, 1153 (9th
Cir. 1997 ("We now apply ordinary principles of contract interpretation in examining
the rights between the parties.*** 'The *wrongful,* i.e., the unjustified or unexcused,
failure to perform a contract is a breach.'" (Internal citations omitted, emphasis in
the original.))

In a case involving a breach by the government, the U.S Supreme Court held:

>    "As set forth in the Restatement of Contracts, the relevant principles
>    specify that, when one party to a contract repudiates that contract, the
>    other party 'is entitled to restitution for any benefit that he has
>    conferred on' the repudiating party 'by way of part performance or
>    reliance.'" Restatement (Second) of Contracts § 373 (1979) (hereinafter
>    Restatement). The Restatement explains that "repudiation" is a
>    "statement by the obligor to the obligee indicating that the obligor will
>    commit a breach that would of itself give the obligee a claim for damages
>    for total breach." *Id.,* § 250. And "total breach" is a breach that "so
>    substantially impairs the value of the contract to the injured party at
>    the time of the breach that it is just in the circumstances to allow him
>    to recover damages based on all his remaining rights to performance."

*Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 608, 120 S. Ct.
2423, 2429, 147 L. Ed. 2d 528 (2000).

**3. Road Donation.**  The road donation condition was satisfied. The new road
was required to be donated to Crook County as a local access road.  This occurred.
See **Exhibit 14 (**Deed of Dedication, dated November 1, 2017).

The import of this donation cannot be minimized.  Waibel donated a nearly 5.5-mile
road to the county, which equates to a donation of about 48.77 acres.  Ex. 14, p 6.

CDA Notice
October 20, 2025
Page **8** of **10**

That donated land occupied by the New Road is now public land. Now the SFR has two roads on its property that are open to public travel.

Since its dedication, the New Road has been continually open to the public, used by the public, and used by the government for access in a manner that is substantially the same as Teaters Road without any barriers. This fulfilled the Contract conditions. Further, since the dedication, Waibel and then SFR have continually maintained the New Road, despite the BLM's qualified commitment to maintain the New Road. See Contract, Exhibit 3, p 6.

**4. NEPA Review—A Joint Condition.** BLM promised to undertake a *National Environmental Policy Act* ("NEPA") process to relinquish the public use of the 1964 Road Easement after construction of the New Road, and after Crook County accepted the donation of the New Road. Waibel agreed to pay the NEPA cost "up to an amount that does not exceed $100,000" per the Contract. Exhibit 3, p 8. Waibel offered to tender that amount repeatedly. The Contract stated:

> [I]f Plaintiffs construct the New Road in accordance with their intent as expressed above, and if the County accepts Plaintiffs' intended donation of the road and offers to convey to the United States an easement and/or right-of-way in accordance with the parties' understanding of intent as expressed above, BLM intends to undertake an appropriate analysis pursuant to NEPA of the proposed action of relinquishing and/or amending to preclude public use of the easement and/or right-of-way the United States presently holds on Teaters Road.

BLM has not satisfied this condition. The NEPA review was the subject of negotiations and mediation with Waibel. Whether BLM took some internal steps to start the NEPA process is unknown, but BLM did not complete the process and, in 2021, refused to accept the road and complete the NEPA process. The Contract explicitly committed BLM "to analyze such a proposed [NEPA] action if and when [Waibel] and the County take the previously described steps," which were road construction and donation. Exhibit 3, p 7.

## VII.  Damages

The *Contract Disputes Act* of 1978 prescribes that "an agency board may grant any relief that would be available to a litigant asserting a contract claim in the United States Court of Federal Claims …." 41 U.S.C. § 7105(e)(2). Here, SFR demands payment of its Contract Claim, as certified below as per 41 U.S.C. §§ 7103(b)(1), 7103(h)(2), in the certified amount of $2,988,619.11, including interest per 41 U.S.C. §7109(a)(1). This certified amount is based on the actual bills/statements verifying costs reasonably and necessarily incurred by Claimant under its Contract performance—constructing and donating the New Road as follows:

CDA Notice
October 20, 2025
Page **9** of **10**

- Exhibit 15: Road Construction Costs, ………….….…..$ 2,843,420.35
- Exhibit 16: Engineering Costs……………………….…$   145,198.76

**Total Damages**…………….…………………………………… $ 2,988,619.11

## VIII. Alternative Relief

In the alternative, NEPA review should be initiated on the 160-acre BLM parcel exchange. Upon initiation of the NEPA review for the property exchange, SFR will tender the Contract sum of $100,000 for the review as agreed in the Contract. When the BLM completes the NEPA process, and if the NEPA Decision identifies a proposed action that requires an additional Realty process, then SFR demands that the BLM initiate and timely complete the Realty process, subject to SFR paying the reasonable cost of the additional Realty process per the Contract.

A NEPA review of the Teaters Road is futile due to the surveyed gap in the easement. A NEPA review on the New Road is precluded because it is an accepted county road. Therefore, a NEPA review should be limited to the property exchange.  Teaters Road should be closed for public access.

## IX. Request for ADR

South Fork Ranch "requests" referral of its claim to an Alternative Dispute Resolution process as per 41 U.S.C. § 7103(h). However, if the Contracting Officer declines such "request" as per 41 U.S.C. § 7103(h)(3), then South Fork Ranch demands payment of its Contract Claim, as certified above. If no timely payment by the BLM Contracting Officer, then South Fork Ranch demands issuance of a "written decision by the contracting officer" as per 41 U.S.C. § 7103(a)(3).[2]

## X. No Waiver.

Under 28 U.S.C.A. § 2409 (b), if SFR prevails and BLM elects to pay SFR,  "an amount which, upon such election, the district court in the same action shall determine to be just compensation for such possession or control," then SFR will demand payment of not less than $ 2,988,619.11 under the facts presented as just compensation.

---

[2] 41 U.S.C. § 7103(f)(2) states that "A contracting officer shall, within 60 days of receipt of a submitted certified claim over $100,000 -- (A) issue a decision; or (B) notify the contractor of the time within which a decision will be issued." *See also* 41 U.S.C. § 7103(f)(5) ("Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal or action on the claim as otherwise provided in this chapter. However, the tribunal concerned may, at its option, stay the proceedings of the appeal or action to obtain a decision by the contracting officer").

CDA Notice
October 20, 2025
Page **10** of **10**


## XI. Certification

SFR hereby certifies that this Contract Claim is made in good faith; that the supporting data is accurate and complete to the best of its knowledge, that the amount requested accurately reflects the Contract damages for which SFR believes the BLM is liable; and that SFR by and through Curt A. Baney, who is duly authorized and does certify this Contract Claim on behalf of the SFR.

**_South Fork Ranch LLC_**

By:_____
     Curt A. Baney, Authorized Representative
     for South Fork Ranch LLC

## XII. Notice of Representation

SFR designates Michael W. Peterkin, of Peterkin Burgess, as the Claimant's representative for all matters regarding this Contract Claim. He is authorized to practice before the U.S. Department of the Interior under 43 C.F.R. §1.3(b)(2) and is a licensed attorney admitted to practice before the Federal Court of Oregon, the 9th Circuit Court of Appeals, and the U.S. Supreme Court. SFR instructs the BLM to contact SFR's legal representative at the address provided above.


Respectfully Submitted on behalf of Claimant


By:_____
     Michael W. Peterkin, OSB #823670
     mpeterkin@peterkinburgess.com
     Peterkin Burgess
     222 NW Irving Ave.
     Bend, OR  97703
     Attorney for Claimant

Exhibit list and attachments as stated.

Copy: Sean Martin, Assistant U.S. Attorney